Erin Rose Ronstadt, SBN 028362
Clayton Richards, SBN 029054
RONSTADT LAW, PLLC
PO Box 34145
Phoenix, AZ 85067
(602) 615-0050
(602) 761-4443 Fax
erin@ronstadtlaw.com
clayton@ronstadtlaw.com
*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Donna Newell,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>Hartford Life and Accident Insurance Company, an ERISA plan fiduciary,<br><br>　　　　　　Defendant. | No.<br><br>**COMPLAINT** |

For her claims against the Hartford Life and Accident Insurance Company ("Hartford" or "Defendant"), an ERISA plan fiduciary, Plaintiff Donna Newell ("Ms. Newell" or "Plaintiff") alleges as follows:

***Jurisdiction, Venue and Parties***

1. This action arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA").

2. As an employee of Blue Cross Blue Shield of Arizona ("Blue Cross"), Ms. Newell was a participant of the Group Long Term Disability Plan for Employees of Blue Cross and Blue Shield of Arizona, Inc. (the "LTD Plan"), an ERISA benefit plan; and the Group Basic Dependent Life, Basic Term Life, Supplemental Life, Basic Accidental Death and Dismemberment, and Supplemental Accidental Death and Dismemberment Plan for Employees of Blue Cross and Blue Shield of Arizona, Inc. ("the Life Insurance Waiver of Premium Plan" or "LWOP Plan"), an ERISA benefit plan (collectively, "the Plans").

3. The Plans are purported ERISA benefit plans established and maintained by Blue Cross for the benefit of its employees.

4. Blue Cross is the Plan Sponsor, Plan Administrator, and a plan fiduciary for each Plan, as well as Ms. Newell's former employer.

5. Hartford is a third-party claims administrator for the Plans.

6. Hartford is a fiduciary of the Plans as defined by ERISA.

7. Under the Plans, Hartford insures employees of Blue Cross for LTD benefits pursuant to policy number GLT-402674 ("the LTD Policy"), and for LWOP benefits pursuant to policy number GL-402674 ("the LWOP Policy") (collectively, "the Policies").

8. Hartford has a duty to administer the Plans prudently and in the best interests of all Plan participants and beneficiaries.

9. At the time Ms. Newell sought LTD and LWOP benefits under the Plans, Hartford administered LTD and LWOP claims for Blue Cross under the Plans, acted on behalf of the Plans, and acted as an agent of Blue Cross and/or the Plans to make final decisions regarding the payment or award of LTD and LWOP benefits for the Plans and to administer the Plans.

10. Hartford's LTD and LWOP Policies state, "[t]he Plan has granted the [Hartford] full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Polic[ies]."

11. Because Hartford is the entity that both pays LTD and life insurance benefits and determines eligibility for those benefits, a structural conflict of interest exists.

12. Ms. Newell currently resides in Maricopa County, Arizona and has been a resident of Maricopa County at all times since becoming a Plan participant.

13. Hartford has its principal place of business in the State of Connecticut.

14. Hartford is licensed and authorized to do business in Maricopa County, Arizona, and resides and is found within Maricopa County within the meaning of the jurisdiction and venue provisions of ERISA, 29 U.S.C. § 1132 and 28 U.S.C. § 1391.

15. This Court has jurisdiction over the subject matter of this action under ERISA, 29 U.S.C. §§ 1132(a), 1132(e)(1), and 28 U.S.C. §§ 2201-02 (declaratory judgments).

16. Venue is proper in this Court under ERISA, 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1391(b).

## GENERAL ALLEGATIONS

### *Ms. Newell's Disability*

17. Ms. Newell suffers from pulmonary sarcoidosis, abdominal distention, and chronic migraine headaches, among other impairments.

18. Ms. Newell's pulmonary sarcoidosis is characterized by symptoms including shortness of breath and extreme fatigue.

19. Ms. Newell's abdominal distention is accompanied by severe abdominal pain.

20. Ms. Newell's migraine headaches are characterized by pain and nausea.

21. Ms. Newell suffers from other medical conditions.

22. Collectively, Ms. Newell's physical medical conditions are Disabling, and prevent her from performing the material duties of her occupation or any occupation under the Policies.

23. Ms. Newell is under the regular care of several physicians.

24. Ms. Newell became Disabled while insured under the Policies.

25. Throughout the history of her claims, Ms. Newell has repeatedly submitted proof of loss corroborating her Disability at Hartford's behest.

### *Disability Under the Policies*

26. To be eligible for LTD benefits, Ms. Newell must meet the definition of "Disabled" as it is defined in the LTD Policy. Under the LTD Policy, "Disability or Disabled means You are prevented from performing one or more of the Essential Duties of: 1) Your Occupation during the Elimination Period; 2) Your Occupation, for the 24 months following the Elimination Period, and as a result Your Current Monthly Earnings are less than 80% of Your Indexed Pre-disability Earnings; and 3) after that, Any Occupation."

-3-

27. The LTD Policy defines an "Essential Duty" as "a duty that: 1) is substantial, not incidental; 2) is fundamental or inherent to the occupation; and 3) cannot be reasonably omitted or changed. Your ability to work the number of hours in Your regularly scheduled workweek is an Essential Duty."

28. The LTD Policy defines "Your Occupation" as "Your Occupation as it is recognized in the general workplace. Your Occupation does not mean the specific job You are performing for a specific employer or at a specific location."

29. The LTD Policy defines "Any Occupation" as "any occupation for which You are qualified by education, training or experience, and that has an earnings potential greater than the lesser of:1) the product of Your Indexed Pre-disability Earnings and the Benefit Percentage; or 2) the Maximum Monthly Benefit."

30. "Pre-disability Earnings" means "Your regular monthly rate of pay including Commissions but not bonuses, tips and tokens, overtime pay or any other fringe benefits or extra compensation, in effect on the last day You were Actively at Work before You became Disabled."

31. "Indexed Pre-disability Earnings means Your Pre-disability Earnings adjusted annually by adding the lesser of 1) 10%; or 2) the percentage change in the Consumer Price Index (CPI-W)."

32. The LTD Policy's Elimination Period is 180 days.

33. Under the LWOP Policy, Ms. Newell would continue to receive life insurance coverage without paying premiums while she is Disabled and is otherwise qualified.

34. Under the LWOP Policy, "the amount of continued coverage: 1) will be the amount in force on the date [Ms. Newell] cease[s] to be an Active Employee; 2) will be subject to any reductions provided by [the LWOP Policy]; and 3) will not increase."

35. Under the LWOP Policy, Disability is defined as the inability "by injury or sickness from doing any work for which [the claimant is], or could become, qualified by: 1) education; 2) training; or 3) experience."

36. The LWOP Policy applies to Basic Life Insurance, Supplemental Life Insurance, and Dependent Life Insurance.

37. Ms. Newell had Basic, Supplemental, and Dependent Life insurance coverage through Hartford pursuant to the LWOP Plan.

**Ms. Newell's Employment**

38. Ms. Newell began working for Blue Cross on January 3, 2012.

39. As of December 8, 2015, Ms. Newell's last day of work, she held the position of Vendor Quality Assurance Analyst.

40. Ms. Newell stopped working on December 8, 2015 due to her Disability.

41. Her job demanded high-level auditing, issue identification, analyzing, reporting, training, and computer software skills.

42. According to Blue Cross's job description, a Vendor Quality Assurance Analyst "[u]nder direction, performs accurate and detailed audits verifying the accuracy of work performed by contract for any outsource organization for individual sales, including but not limited to sales lead records and enrollment applications to comply with Blue Cross Blue Shield Association quality requirements for Sales Standards, URAC or other performance requirement guidelines."

43. The job description's required skills include "[i]ntermediate skill in use of office equipment, including copiers, fax machines, scanner and telephones"; "[a]dvanced [personal computer] proficiency"; "[i]ntermediate proficiency in spreadsheet, database and word processing software"; "[r]equires the ability to work with a variety of systems, including but not limited to Salesforce, Broker Portal, TPS, Webex Conference or similar Web Conferencing Tool"; and "[w]orking knowledge of HIPAA and privacy requirements."

**Hartford's Claim Handling**

44. At the onset of her Disability, Ms. Newell first applied for, and received, short-term disability ("STD") benefits through Hartford, who also administered STD benefits for Blue Cross.

-5-

45. Ms. Newell received STD benefits through the maximum benefit period, which ended April 24, 2016.

46. On April 7, 2016, Hartford notified Ms. Newell in a letter that it would begin evaluating her claim for LTD benefits.

47. On May 4, 2016, Hartford notified Ms. Newell in a letter that it would begin evaluating her claim for LWOP benefits.

48. On May 31, 2016, Hartford notified Ms. Newell that it needed an extension of time to make its decision for Ms. Newell's claim for LTD benefits.

49. On June 9, 2016, Hartford notified Ms. Newell that it needed an extension of time to make its decision for Ms. Newell's claim for LWOP benefits.

50. On June 24, 2016, Hartford denied Ms. Newell's LTD and LWOP claims.

51. Ms. Newell timely appealed the LTD and LWOP determinations on August 10, 2016.

52. Hartford reviewed the LTD claim again, and on August 24, 2016, Hartford upheld its denial of Ms. Newell's LTD claim.

53. Ms. Newell timely appealed the LTD determination a second time on January 19, 2017.

54. On February 28, 2017, Hartford reversed its decision and awarded Ms. Newell LTD benefits effective June 6, 2016 under the Your Occupation definition of Disability.

55. On March 6, 2017 Hartford upheld its Denial of Ms. Newell's LWOP claim ("the Final LWOP Denial").

56. In its Final LWOP Denial, Hartford upheld Ms. Newell's denial of LWOP benefits because it decided that Ms. Newell's conditions did not "preclude performance of any work."

57. Hartford continued to pay Ms. Newell's LTD benefits during this time.

58. On January 11, 2018, however, Hartford notified Ms. Newell that it had initiated a review to determine if she would qualify for LTD benefits on and after June 6, 2018, the beginning of the Any Occupation phase of Disability.

59. During its review, Hartford obtained medical evidence supporting Ms. Newell's inability to work, including an April 30, 2018 disability form from her treating hepatologist provider, Ashley Hepner, NP.

60. NP Hepner stated in the form that Ms. Newell suffered from "severe [abdominal] pain and headaches [that] impair all [activities of daily living] at this time." NP Hepner concluded that Ms. Newell's current status was "unchanged" and could not provide any estimation for an expected return to work date.

61. NP Hepner identified multiple objective findings and functional limitations to support her conclusions.

62. Hartford chose to ignore the medical opinion of Ms. Newell's treating provider and, on June 6, 2018, notified Ms. Newell it was unable to determine if she was eligible for LTD benefits on or after June 6, 2018 but that her LTD benefits would continue to be paid while they investigated her claim for ongoing benefits.

63. On July 13, 2018, Ms. Newell's treating internist, Dr. Barbara Backer, completed a disability form for Hartford.

64. In the form, Dr. Backer stated that Ms. Newell "is miserable due to severe pain [and abdominal] blockage . . . headaches [and] nausea," and that it is "difficult [for Ms. Newell] to leave [the] house due to pain." Dr. Backer stated that Ms. Newell was "unable to work now" and provided no expected return to work date.

65. Dr. Backer identified multiple objective findings and functional limitations to support her conclusions.

66. On July 16, 2018, Dr. Chalonda K. Hill—a Hartford consultant—reviewed Ms. Newell's LTD claim.

67. Dr. Hill acknowledged that Ms. Newell is "functionally impaired due to sarcoidosis which is supported by consistently reported subjective complaints and objective

-7-

findings." However, Dr. Hill opined that Ms. Newell "is capable of working 8 hours per day for 40 hours per week" with restrictions to her ability to stand, walk, and lift.

68.  On July 23, 2018, Hartford commissioned an Employability Analysis Review ("EAR").

69.  Van Galasso, M.A., C.R.C. only reviewed Ms. Newell's functional capabilities from the information provided by Dr. Hill.

70.  Mr. Galasso did not review any of the functional limitations provided to Hartford by NP Hepner or Dr. Backer—Ms. Newell's attending physicians.

71.  In the EAR, based on a limited and incomplete scope of review, Mr. Galasso concluded that Ms. Newell could perform 11 other occupations with Dr. Hill's restrictions "with minimum training in tools and/or materials."

72.  On July 25, 2018, Hartford terminated Ms. Newell's LTD benefits because it concluded that "there are a number of occupations for which [she is] qualified that are within [her] physical capabilities." Hartford determined that Ms. Newell was "not prevented from performing the essential duties of Any Occupation."

73.  On September 7, 2018, NP Hepner completed an updated disability form for Hartford.

74.  NP Hepner concluded that Ms. Newell's current status was "unchanged" and could not provide any estimation for an expected return to work date.

75.  NP Hepner identified multiple objective findings and functional limitations to support her conclusion.

76.  On September 13, 2018, Dr. Backer completed an updated disability form for Hartford.

77.  In the form, Dr. Backer stated that it was "[d]ifficult [for Ms. Newell] to leave [the] house due to pain [and abdominal] bloating and headaches with nausea" and that Ms. Newell "gets out of breath due to [her abdominal] girth." Dr. Backer concluded that Ms. Newell's current status had "retrogressed" and stated that Ms. Newell would we be unable to return to work indefinitely.

78. Dr. Backer identified multiple objective findings and functional limitations to support her conclusions.

79. Ms. Newell timely appealed the LTD determination on October 24, 2018.

80. Despite the new evidence from Ms. Newell's attending physicians and treating providers, on December 5, 2018, Hartford notified Ms. Newell that it needed an extension of time to make its decision for Ms. Newell's claim for LTD benefits because they needed Ms. Newell to attend an Independent Medical Examination ("IME").

81. Hartford arranged for Ms. Newell to be examined by a physician with strong professional ties to the disability industry.

82. On December 8, 2018, known insurance company consultant, Dr. Brian McCrary, examined Ms. Newell at Hartford's behest. Dr. McCrary opined that Ms. Newell "is capable of working in a sedentary PDL on a full time [*sic*] basis."

83. Dr. McCrary discounted Ms. Newell's chronic pain complaints opining that "[h]er symptoms are out of proportion to any objective or diagnostic findings."

84. Dr. McCrary dismissed Ms. Newell's attending physicians' opinions, arguing that "[h]er attending physician's opinion appears to be based primarily upon subjective complaints and statements from the claimant stating that she cannot perform the duties rather than based on objective or actual diagnostic criteria."

85. On January 4, 2019, Hartford upheld its Denial of Ms. Newell's LTD benefits ("the Final LTD Denial").

86. To support the Final LTD Denial, Hartford obtained two more "independent" medical reviews to assess Ms. Newell's claim file and opine regarding Ms. Newell's medical conditions, restrictions, and limitations.

87. These new reviewers provided Hartford with new reasons for denying Ms. Newell's claim.

88. Hartford did not provide Ms. Newell with an opportunity to review and respond to this unfavorable evidence before issuing the Final LTD Denial.

Case 2:20-cv-01408-MTL   Document 1   Filed 07/16/20   Page 10 of 20

89. Hartford upheld Ms. Newell's denial of LTD benefits because it decided that Ms. Newell is not disabled under the Any Occupation standard of the policies because she could perform Sedentary work and there are Sedentary occupations identified that Ms. Newell could perform based on her education, training and experience that provide the earnings potential required by the definition of Any Occupation.

90. Since the termination of her LTD benefits, Ms. Newell has experienced significant financial duress.

91. Ms. Newell had to rely on Nutrition Assistance benefits through the Arizona Department of Economic Security to survive and her car was repossessed.

92. She has had to rely on loans and financial assistance from family members for financial survival.

93. Collectively, Ms. Newell's conditions are Disabling and prevent her from performing the material duties of her occupation or any occupation under the Policies.

94. Ms. Newell exhausted her administrative remedies and timely filed this lawsuit.

**The Hartford's Financial Motivation for Terminating Ms. Newell's Claims**

95. In November 2012, The Hartford introduced a procedure called "segmentation" into its LTD claims consideration process.

96. The Hartford divides all its disability insurance clients into 3 segments.

97. A claimant is classified as segment I if liability is clear, like when a claimant has a short-term or terminal illness.

98. Segment II is similar to segment III, but less complicated. Claimants classified as segment II have illnesses without an easily predictable trajectory, like segment III, but do not have the medical, occupational, and/or financial complexities of segment III.

99. A claimant is classified as segment III if he or she has "medical, occupational and/or financial complexities and an uncertain outcome."

100. On information and belief, the Hartford uses segmentation to determine which claims it will have the least liability if it unfairly terminates them.

101. On information and belief, the Hartford devotes more resources to segment III claims than segment I claims in an effort to manufacture adverse evidence to support a denial of those claims.

102. On information and belief, the Hartford's repeated denials and attempts to terminate Ms. Newell's coverage of Ms. Newell's claims was the result of, if not directly informed by, Hartford's segmentation practices.

**COUNT I**
**(Recovery of LTD and LWOP Plan Benefits)**
**(Defendant Hartford)**

103. All other paragraphs are incorporated by reference.

104. The Plans are Employee Welfare Benefit Plans as defined in ERISA, 29 U.S.C. § 1002.

105. The Plans represent LTD and LWOP coverage and a promise to provide LTD and LWOP benefits until Ms. Newell is no longer Disabled under the terms of the Plans.

106. Per the LTD Plan, Ms. Newell continues to be Disabled from her occupation or Any Occupation.

107. Per the LWOP Plan, Ms. Newell continues to be Disabled "from doing any work for which [she is], or could become, qualified by 1) education; 2) training; or 3) experience."

108. Ms. Newell has claimed the benefits under each Plan to which she is entitled.

109. Ms. Newell reasonably expected that her medical conditions met the requirements of Disability as defined by the Plans and that she would receive benefits under the Plans until she reaches her Social Security Normal Retirement Age or until he was no longer Disabled.

110. Despite the coverage of Ms. Newell's Disability, Hartford improperly terminated her LTD and LWOP benefits in breach of the Plans and ERISA.

111. Hartford's collective conduct was arbitrary, capricious, an abuse of discretion, not supported by substantial evidence, and clearly erroneous.

112. Although the LTD and LWOP Policies state Hartford has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of [the Policies,]" under ERISA, that can only be true if the Plan reserved that discretion to the Plan Administrator, the Plan terms provide a mechanism for the Plan Administrator to delegate that discretion, and there is evidence that the discretion was delegated in accordance with the terms of the Plan.

113. On information and belief, the Plan: does not reserve discretion to the Plan Administrator, does not contain terms by which discretion can be delegated, and therefore, under ERISA, discretion could not be delegated to Hartford.

114. Even if Blue Cross properly delegated discretionary authority to Hartford, in light of Hartford's wholesale and flagrant procedural violations of ERISA, Ms. Newell's claim should be entitled to *de novo* review. *See Halo v. Yale Health Plan,* 819 F.3d 42, 60-61 (2d Cir. 2016) ("when denying a claim for benefits, a plan's failure to comply with the Department of Labor's claims-procedure regulation, 29 C.F.R. § 2560.503-1, will result in that claim being reviewed *de novo* in federal court, unless the plan has otherwise established procedures in full conformity with the regulation and can show that its failure to comply with the claims-procedure regulation in the processing of a particular claim was inadvertent and harmless.")

115. Instead of evaluating a participant's eligibility based on the applicable plan language and medical evidence, Ms. Newell is informed and believes that Hartford makes claims decisions based on the claims resources and financial risk it faces on certain claims.

116. Upon information and belief, the Hartford, in part, relies upon its internal practice of segmentation to streamline these decisions.

117. Hartford wrongfully denied Ms. Newell's disability benefits without providing a coherent explanation for its denials, and in a way that conflicts with the plain language of the Plans, violating 29 U.S.C. §§ 1109, 1132.

118. Hartford did not properly consider all of the available evidence when terminating Ms. Newell's benefits.

119. In fact, Hartford routinely ignored the opinions of Ms. Newell's treating providers, who repeatedly provided statements to Hartford supporting Ms. Newell's ongoing claims.

120. Upon information and belief, Hartford used in-house reviewers in evaluating Ms. Newell's claim, because it knew that the in-house reviewers' recommendations would be unfavorable for the continuation of Ms. Newell's benefits.

121. The peer reviewers arbitrarily reached their opinions based on insufficient evidence or investigation.

122. None of Hartford's reviewing physicians ever set forth sufficient reasons explaining why Ms. Newell's treating doctors' opinions were incorrect.

123. Hartford failed to adequately explain why it credited the physician reviewers over Ms. Newell's treating physicians.

124. Hartford failed to conduct a full and fair review.

125. Instead of duly relying upon physicians and other providers with an established history of treatment with Ms. Newell, Hartford relied upon the opinions of biased consultants and examiners, such as Dr. Brian McCrary.

126. Hartford misstated medical evidence for its own financial benefit.

127. Hartford relied on findings that constitute "clearly erroneous findings of fact," such as Dr. McCrary's biased report, to terminate Ms. Newell's benefits.

128. Hartford abused its discretion by basing its decision on unreliable and inaccurate information. When confronted with this knowledge, Hartford ignored the inaccuracies or created new reasons for denial.

129. Upon information and belief, Hartford tainted its medical file reviewers by giving the reviewers inaccurate information regarding Ms. Newell, while also failing to provide its reviewers with all of the relevant evidence.

130. As noted above, the July 23, 2018 Employability Analysis Report completed by Hartford's Return to Work Case Manager relied exclusively on the restrictions and

limitations assigned by Hartford's non-examining occupational medicine consultant, Dr. Chalonda K. Hill.

131. Upon information and belief, Hartford provided its reviewers and vendors with internal notes and financial information about the claim, compromising their ability to make "independent" medical determinations and creating further bias in reviews.

132. Hartford routinely emphasizes information that favors a denial of benefits while deemphasizing other information that suggests a contrary conclusion.

133. Hartford unreasonably withheld relevant documents throughout the entire claim and poorly managed the file, which is evidenced, in part, by its failure to provide all relevant documents.

134. Hartford's failure to comply with ERISA's disclosure requirements and poor management of the file demonstrate its abuse of discretion and improper claims handling.

135. In terminating Ms. Newell's LTD and LWOP benefits, Hartford completely disregarded evidence that Ms. Newell's conditions had not changed or improved.

136. Hartford has no evidence that Ms. Newell's conditions changed or improved since it determined that she met the definition of Disabled in the Policy.

137. The peer reviewers were not given the Plan or other important records for reaching its decision that Ms. Newell could perform work.

138. Hartford engaged in other procedural irregularities, which it did to serve its own financial best interests.

139. On information and belief, Hartford engaged in claim discussions to decide the directions of appeals without having reviewed all of the medical evidence, demonstrating its predetermined path of terminating benefits.

140. Upon information and belief, Hartford's segmentation of claims informs this practice.

141. Hartford intentionally gathered evidence to stack the deck in its favor and against Ms. Newell.

142. Ms. Newell alleges upon information and belief that Hartford has a parsimonious claims handling history.

143. Hartford failed to conduct a "meaningful dialogue" regarding Ms. Newell's claim.

144. Under the de novo standard of review, to be entitled to benefits Ms. Newell need only prove by a preponderance of the evidence that she is Disabled.

145. Even under the abuse of discretion standard of review, Hartford abused its discretion, because its decision terminating Ms. Newell's LTD and LWOP benefits was arbitrary and capricious and caused or influenced by Hartford's, its reviewing physicians, and its vendors' financial conflicts of interest. These conflicts of interest precluded the full and fair review required by ERISA, 29 U.S.C. 1133(2) and 29 C.F.R. § 2560.503-1(g)(1) and (h)(2).

146. Ms. Newell is entitled to discovery regarding the effects of the procedural irregularities and structural conflict of interest that infiltrated the claims handling process and also regarding the effects of Hartford's reviewing physicians', its employees', and its vendors' financial conflicts of interest, biases, and motivations on the decision terminating Ms. Newell's LTD and LWOP claims.

147. Under the de novo standard of review, Ms. Newell is entitled to discovery regarding, among other things, the credibility of Hartford's medical reviews and Hartford's lack of partiality due to its financial conflicts of interest. *Opeta v. Nw. Airlines Pension Plan for Contract Employees*, 484 F.3d 1211, 1217 (9th Cir. 2007) (under the de novo standard of review, new evidence may be admitted regarding, among other things: "the credibility of medical experts… [and] instances where the payor and the administrator are the same entity and the court is concerned about impartiality" (*quoting Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1026-27 (4th Cir. 1993)).

148. Pursuant to the coverage provided in the Plans, to ERISA 29 U.S.C. § 1132(a)(1)(B), and to applicable federal law, Ms. Newell is entitled to recover all benefits due under the terms of the Plans, and to enforce her rights under the Plans.

149. Ms. Newell is entitled to reinstatement of any other employee benefits that were terminated, discontinued, or suspended as a result of the termination of her LTD and LWOP benefits. She is entitled to a restoration of the *status quo ante* before LTD benefits were wrongfully terminated.

150. Pursuant to 29 U.S.C. § 1132(g), Ms. Newell is entitled to recover her attorneys' fees and costs incurred herein.

151. Ms. Newell is entitled to prejudgment interest on the benefits to which she is entitled and on her damages at the highest legal rate until paid.

## COUNT II
**(Breach of Fiduciary Duty)**
**(Defendant Hartford)**

152. All other paragraphs are incorporated by reference.

153. Under 29 U.S.C. § 1132(a)(3), this Court may enjoin any act or practice that violates ERISA or the terms of the Plan, as well as grant other appropriate equitable relief, provided that such relief is not recoverable under 29 U.S.C. § 1132(a)(1)(B).

154. Hartford is a fiduciary and owes fiduciary duties to Plan participants, including Ms. Newell.

155. Under 29 U.S.C. § 1104(a), Hartford is required to discharge its duties with the care, skill, prudence, and diligence under the circumstances that a prudent man or woman acting in like capacity and familiar with such matters would use under 29 U.S.C. § 1104(a).

156. Under ERISA, which is founded in trust principles, Hartford is required to administer claims in the best interests of beneficiaries and participants as part of its fiduciary duty.

157. In multiple ways throughout the administration of Ms. Newell's claim, Hartford breached its fiduciary duties pursuant to 29 U.S.C. § 1132(a)(3).

158. Hartford's arbitrary and capricious claims handling generally constitutes a breach of fiduciary duty, because Hartford's claims handling was discharged imprudently

and caused Ms. Newell serious harm that cannot be recovered under 29 U.S.C. § 1132(a)(1)(B).

159.  Hartford's disregard for the supportive opinions of Ms. Newell's treating providers, without adequate reasons to discount their opinions, is an example of Hartford's arbitrary and capricious conduct.

160.  Hartford's reliance upon the opinion of a biased examiner is a breach of fiduciary duty.

161.  To the extent that Hartford's denial of benefits caused Ms. Newell harm unrecoverable under 29 U.S.C. § 1132(a)(1)(B), then that harm is recoverable under 29 U.S.C. § 1132(a)(3).

162.  On information and belief, Hartford instructs and/or incentivizes certain employee(s) to terminate fully insured LTD and LWOP claims and appeals based on bias or its financial interests.

163.  Ms. Newell is informed and believes that Hartford's employees are trained in administering claims in the best interests of Hartford, not Plan participants.

164.  Hartford demonstrated bias and malice against Ms. Newell through its employees. Instead of fully and fairly reviewing the medical evidence, Hartford unreasonably denied Ms. Newell's claim based on unreliable evidence, such as Dr. McCrary's IME.

165.  Hartford's failure to act prudently and in the best interests of Ms. Newell is a breach of fiduciary duty requiring appropriate equitable relief following discovery of Hartford's conduct as it relates to Ms. Newell's claim.

166.  Ms. Newell's treating providers provided statements supporting her ongoing Disability on at least four occasions throughout 2018.

167.  As noted above, in July 2018, Dr. Backer characterized Ms. Newell's pain as "severe," noted Ms. Newell was "miserable" because of her symptoms, and that it was very difficult for Ms. Newell to leave her home due to these symptoms.

168. In September 2018, Dr. Backer stated Ms. Newell was unable to sit, stand, or walk for any length of time due to abdominal pain, headaches, sarcoidosis, and extreme fatigue.

169. She indicated Ms. Newell's condition had gotten worse.

170. Hartford ignored these opinions and, instead, sought the opinions of non-examining consultants and a one-off examiner, who all opined Ms. Newell was not Disabled.

171. Hartford's disregard for objective evidence of Ms. Newell's Disability is a breach of fiduciary duty.

172. Ms. Newell is informed and believes that Hartford has targeted claims under the Plan, including Ms. Newell's which is a breach of fiduciary duty.

173. On information and belief, Hartford breached its fiduciary duty to Ms. Newell by terminating her claim in an effort to avoid its financial liability.

174. Based on the facts of this case, Ms. Newell has "other equitable relief" available to her in several forms, including but not limited to surcharge,[1] because the relief available under 29 U.S.C. § 1132(a)(1)(B) does not make Ms. Newell whole for her losses from Hartford's breaching conduct.

175. Ms. Newell incurred significant financial losses resulting from the wrongful termination of her LTD benefits, including incurring additional debt.

176. The Court has broad discretion to fashion appropriate relief to make Ms. Newell whole and should mold the relief necessary to protect the rights of the participants.

177. Ms. Newell is entitled to injunctive or mandamus relief under 29 U.S.C. § 1132(a)(3).

178. She is entitled to enjoin any act or practice by Hartford that violates ERISA or the Plan, or seek other appropriate equitable relief that is traditionally available in equity.

---

[1] A surcharge is a kind of equitable monetary remedy against a trustee, which puts the beneficiary in the position he would have attained but for the trustee's breach. Surcharge extends to a breach of trust committed by a fiduciary encompassing any violation of a duty imposed upon that fiduciary.

179. Hartford was unjustly enriched as a result of its breach of fiduciary duty violations, because it wrongfully withheld Ms. Newell's benefits for its own profit.

180. Hartford engaged in several procedural violations in an attempt to circumvent its obligations under ERISA, which is conduct the Court can enjoin.

181. Hartford acted with malice and in bad faith against Ms. Newell, which constitutes a violation of its fiduciary obligations.

182. ERISA "does not elsewhere adequately remedy" the injuries caused to Ms. Newell by Hartford's breach of fiduciary duty violations.

183. As a direct and proximate result of the breaches of fiduciary duty, Ms. Newell suffered actual, *significant* financial harm and has incurred financial expense.

184. Ms. Newell is entitled to prejudgment interest on the benefits to which he is entitled and on his damages at the highest legal rate until paid in full.

185. Pursuant to 29 U.S.C. § 1132(g), Ms. Newell is entitled to recover his attorneys' fees and costs incurred herein.

**WHEREFORE**, on all claims, Ms. Newell prays for entry of judgment against Defendants as set forth in this Complaint, which includes:

A. All past LTD benefits under the terms of the LTD Plan;

B. All ongoing LWOP benefits;

C. Clarifying and determining Ms. Newell's rights to future benefits under the terms of the Plans;

D. For any other benefits Ms. Newell may be entitled to receive under the Plans due to her disability;

E. All other equitable relief that is proper as a result of Hartford's breaches of fiduciary duties;

F. An award of Ms. Newell's attorneys' fees and costs incurred herein;

G. An award of prejudgment interest on benefits and damages at the highest legal rate until paid; and

H. For such and further relief as the Court deems just, equitable, and reasonable.

Dated this 16th day of July 2020.

>RONSTADT LAW, PLLC
>
>By: *s/ Erin Rose Ronstadt*
>     Erin Rose Ronstadt
>     Clayton W. Richards
>     Attorneys for Plaintiff

**RONSTADT LAW, PLLC**
P.O. BOX 34145, Phoenix, AZ 85067
6122 N. 7th St., Ste. B, Phoenix, AZ 85014
(602) 615-0050